UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § § | |
| v. | § § | CRIMINAL NO.      C-11-290 |
| ABEL CRISPIN GAMEZ, JESUS MARTINEZ, and RUBEN TORRES | § § § § § | |

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANTS' MOTIONS TO SUPPRESS

This matter comes before the Court on Defendant Ruben Torres' Motion to Suppress (D.E. 25), Defendant Jesus Martinez' Motion to Suppress (D.E. 26), and Defendant Abel Crispin Gamez' Motion to Suppress (D.E. 27). Having carefully considered the parties' memoranda, the evidence presented at the suppression hearing, and otherwise being fully informed, the Court DENIES Defendants' Motions to Suppress.

## I.    INTRODUCTION

This case arose out of the seizure by Border Patrol agents of approximately ten kilograms of marijuana from Defendants in the early morning hours of March 7, 2011. Defendants were initially stopped by Border Patrol agents for suspicion of alien smuggling, but upon searching Defendants' vehicle, agents discovered two backpacks containing ten individually wrapped bundles of marijuana. On March 23, 2011, a federal grand jury returned an indictment charging Defendants with one count of conspiracy to possess a controlled substance with intent to distribute, in violation of 21 U.S.C.

§ 846, and one count of possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D). (D.E. 17.)  Defendants individually filed motions to suppress arguing that the Border Patrol agents who seized the marijuana violated their Fourth Amendment right to be free from unreasonable searches and seizures.  A suppression hearing was held on April 29, 2011.  On June 15, 2011, ruling from the bench, the Court denied Defendants' motions to suppress and then held a stipulated bench trial.  Defendants were found guilty on both counts of the indictment.  This Memorandum Opinion and Order Denying Defendants' Motions to Suppress further explains the Court's findings of fact and conclusions of law as stated on the record prior to the bench trial on June 15, 2011.

## II.    STATEMENT OF FACTS

On March 7, 2011, at approximately 2:30 a.m., Agent Mendoza of the United States Border Patrol observed a white Cadillac sedan traveling southbound on Highway 281 perform a u-turn approximately one hundred yards north of the Falfurrias Border Patrol Check Point in Southern Texas.  At the same time, using an unmanned surveillance aircraft, Border Patrol was tracking a group of illegal aliens attempting to circumvent the Check Point.  The illegal aliens were located about a mile-and-a-half to three miles north of the Check Point on the west side of Highway 281. Based on his experience as a Border Patrol agent and years spent working at the Falfurrias Check Point, Agent Mendoza was aware that narcotics smuggling and alien trafficking were prevalent in this isolated area.  Although the Check Point is located approximately seventy-five miles north of the U.S.-Mexico border, illegal aliens and other smugglers commonly circumvent it by traveling through the brush on foot and then arranging for a vehicle to pick them up on the north side of the Check Point.  Furthermore, based on his experience, Agent Mendoza knew that there is minimal

2

traffic on Highway 281 at 2:30 a.m., he did not recognize the white Cadillac as belonging to one of the local ranchers, and it was unusual for local ranch traffic to make a u-turn that close to the Check Point.

Given the above-described circumstances, Agent Mendoza found the vehicle's behavior suspicious, and he notified Agent Quezada, who was stationed approximately three miles to the north, that a white Cadillac had just made a u-turn one hundred yards in front of the Check Point. At the time he received the call from Agent Mendoza, Agent Quezada was assisting a group of Border Patrol agents pursuing a group of suspected illegal aliens traveling through the brush west of Highway 281. The Border Patrol agents had apprehended most of the illegal aliens, but Agent Quezada received information from the aerial surveillance drone that two individuals had broken away from the main group and were located near his position, about fifty to seventy-five yards from the Highway and about three miles north of the Check Point. Based on his experience, Agent Quezada, knew that it is common practice for alien smugglers, when threatened with capture, to break off and abandon the group they are guiding in order to escape. The illegal aliens had been apprehended by Border Patrol only minutes before, and given the information available to him at this time, Agent Quezada believed it likely that the Cadillac was attempting to pick up the two individuals that had separated from the main group.

Agent Quezada observed the white Cadillac sedan pass his location heading northbound on Highway 281. Agent Quezada followed the Cadillac a short distance, activated his emergency lights, and performed a vehicle stop at 2:47 a.m. After he stopped the vehicle, Agent Quezada radioed Border Patrol to determine if the Cadillac had passed through the Check Point earlier that morning. The agents indicated that the Cadillac passed through the Falfurrias Check Point at 2:13 that

3

morning.

When Agent Quezada approached the vehicle, he observed four individuals—two in the back and two in the front.  Agent Quezada asked the vehicle's occupants whether they were United States citizens.  Defendant Gamez, the driver, answered, "Yes."  The other individuals, however, did not respond.  Mr. Gamez and his wife, who was seated in the front passenger seat, handed Agent Quezada their Texas driver's licenses.  Defendant Torres, who was in the rear seat, produced a Texas identification card.  Defendant Martinez, also in the rear seat, indicated that he did not have an identification card and provided Agent Quezada his name.

Agent Quezada observed that the two back seat passengers were not responding to his questions and that they appeared to have been recently walking through the brush, as their clothes were covered in soil and torn, and they had brush residue and leaves stuck to them.  In the area near the Check Point, the leaves are sticky, and based on his experience, Agent Quezada knew that when walking through the brush, the leaves would stick to one's clothes.  Additionally, Agent Quezada observed that there were two backpacks lying on the back seat between the individuals, and that they contained the same leaves and brush residue as their clothing, indicating that they had recently been carried through the brush.  Agent Quezada asked Mr. Gamez if they had all passed through the Check Point together, and Mr. Gamez indicated that they had.

Next, Agent Quezada contacted his supervisor, Agent Jose Ramirez, at the Falfurrias Check Point to advise him of the situation.  Agent Quezada additionally requested that the Check Point perform a criminal records check for each of the detainees.  While Agent Quezada was waiting on the records check, Agent Ramirez arrived on scene and spoke with Mr. Gamez.  Contrary to what Mr. Gamez previously told Agent Quezada, he now indicated that he picked up the individuals in

4

the rear seat north of the Check Point.

Agent Ramirez had been a Border Patrol agent for nine years and possessed considerable experience dealing with alien smuggling operations. According to Agent Ramirez, smugglers commonly utilize "brush guides" to bring illegal aliens around check points such as Falfurrias. It is not unusual for these guides to be U.S. citizens. Based on the information they had collected, the agents felt fairly certain that the detainees in the Cadillac were involved in alien smuggling, and Agent Ramirez believed the two individuals in the back seat likely served as the brush guides for the group of illegal aliens Border Patrol had just apprehended. Furthermore, the Check Point informed the agents that the detainees had criminal records. Given the circumstances, Agent Ramirez decided to transport the detainees to the Falfurrias Border Patrol Check Point, located approximately three miles to the south. In total, Defendants had been detained a little over ten minutes.

After arriving at the Check Point, the agents learned that Defendants had extensive criminal histories. Additionally, after speaking with some of the illegal aliens that had been apprehended earlier that evening, the agents learned that they had been abandoned by their brush guides. This information further contributed to the agents' belief that Mr. Torres and Mr. Martinez were the missing guides. At this point, Agent Quezada instructed Agent Ramiro Muniz to retrieve the backpacks from the Cadillac to search them for food, water, clothing, and any other evidence the detainees were working as brush guides. Agent Muniz went out to the Cadillac and opened up the door to the back seat. As he leaned into the back seat, Agent Muniz smelled the odor of marijuana. Agent Muniz then lifted one of the backpacks, and based on its weight and feel, he concluded that it likely contained marijuana. The agents then opened the backpacks and observed ten individually wrapped bricks of marijuana.

5

III.    **ANALYSIS**

A.    **Initial Detention Supported by Reasonable Suspicion**

First, Defendants argue that they were unlawfully detained without reasonable suspicion in violation of the Fourth Amendment of the Constitution when Agent Quezada stopped Defendant Gamez' white Cadillac sedan after it made a legal u-turn approximately one hundred yards north of the Falfurrias Border Patrol Check Point. (D.E. 43, 44, 45.)  The Government responds that given the totality of the circumstances available to Agent Quezada at the time of the investigatory detention, he possessed reasonable suspicion to briefly detain the vehicle, and therefore, the stop did not constitute a Fourth Amendment violation.

Border Patrol agents on roving patrol may temporarily detain vehicles for investigation when they are aware of specific, articulable facts that, together with any rational inferences that may be drawn from those facts, reasonably warrant suspicion that the vehicle is involved in criminal activity. *United States v. Inocencio*, 40 F.3d 716, 722 (5th Cir. 1994).  The Fifth Circuit articulated a list of eight factors that courts may consider in determining whether an agent possessed reasonable suspicion: (1) characteristics of the area, (2) arresting agent's previous experience with criminal activity, (3) proximity to the border, (4) usual traffic patterns on the road, (5) information about recent illegal alien or narcotics trafficking, (6) behavior of the vehicle's driver, (7) appearance of the vehicle, and (8) number, appearance, and behavior of the passengers. *Id.*; *see also United States v. Brignoni-Ponce*, 95 S. Ct. 2574, 2582 (1975); *United States v. Olivares-Pacheco*, 633 F.3d 399, 407–08 (5th Cir. 2011) (listing several cases where attempting to avoid a Border Patrol check point was deemed suspicious); *United States v. Rodriguez*, 564 F.3d 735, 741 (5th Cir. 2009); *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).  In examining the Border Patrol

6

agent's determination of reasonable suspicion, the Court must consider the totality of the circumstances known to the agent at the time of the stop. *Rodriguez*, 564 F.3d at 741. Thus, as with any reasonable suspicion determination, "factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion." *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999).

In the case at hand, the Court concludes that there were numerous factors that contributed to a reasonable suspicion of criminal activity, and therefore, the initial investigatory detention was justified. First, the area surrounding the Falfurrias Border Patrol Check Point is subject to a large quantity of illegal alien and narcotics trafficking due to smugglers' efforts to circumvent the Check Point. Additionally, traffic patterns on this stretch of Highway 281 at 2:30 in the morning are minimal, and Defendant Gamez' white Cadillac stood out because it was not recognized as belonging to one of the nearby ranchers. Furthermore, it would have been unusual for local ranch traffic traveling south on Highway 281 to turn around that close to the Check Point, as opposed to one of the other turnarounds, and the Cadillac had passed through the Check Point approximately thirty minutes earlier. Consequently, the vehicle and Mr. Gamez' behavior stood out from the usual traffic patterns for this area and the time of day. Lastly, the Cadillac was twice spotted in the Check Point area at the same time agents were engaged in an operation to apprehend a group of illegal aliens a few miles north of the Check Point. Given these circumstances, Agent Quezada reasonably suspected the Cadillac was engaged in criminal activity—i.e., that it was either trying to pick up illegal aliens and/or the brush guides.

In sum, having considered the totality of the circumstances available to Agent Quezada at the time of the initial detention and applying the eight factors enumerated above, the Court concludes

that Agent Quezada possessed a reasonable suspicion of criminal activity warranting a brief investigatory detention to confirm or dispel his suspicions.  In addition to the fact that the vehicle performed a u-turn just one hundred yards from the Border Patrol Check Point, there were several other factors indicating that the vehicle's occupants were engaged in criminal activity.  These factors, when taken together and viewed in light of Agent Quezada's training and experience, provided more than enough suspicion to justify a brief investigatory detention.

### B.      Scope of the Seizure Was Reasonable

Next, Defendants argue that, even if the initial stop was based on reasonable suspicion, the scope of the investigatory detention exceeded what was reasonable under the circumstances and constituted a Fourth Amendment violation.  Defendants assert that the Border Patrol agents unreasonably prolonged the seizure by transporting them back to the Falfurrias Border Patrol Check Point for further investigation, unlawfully arrested Defendants without probable cause, and then performed an unlawful, warrantless search of the vehicle and backpacks. (D.E. 43, 45.)  The Government counters that prolonging the investigative detention was reasonably necessary because the initial seizure revealed new information of criminal activity that warranted further investigation. (D.E. 48 at 5.)

Generally, an investigatory detention based on reasonable suspicion of criminal activity "may last as long as is reasonably necessary to effectuate the purpose of the stop, including the resolution of reasonable suspicion, supported by articulable facts within the officer's professional judgment, that emerges during the stop." *United States v. Brigham*, 382 F.3d 500, 512 (5th Cir. 2004); *see also Terry v. Ohio*, 392 U.S. 1 (1968).  The Court concluded above that Agent Quezada possessed a reasonable suspicion of criminal activity warranting a brief investigatory detention.  Once Agent

Quezada approached the vehicle, he observed that the back seat passengers were covered in leaves and soil, had torn clothes, and that the backpacks lying on the seat next to them were similarly soiled and covered in leaves.   Based on his experience, Agent Quezada believed the two back seat passengers—Defendants Torres and Martinez—had recently been in the brush near the highway. Additionally, Mr. Martinez was unable to produce any identification, and Mr. Gamez gave inconsistent answers to the agents. First, Mr. Gamez indicated to Agent Quezada that all four of the occupants had passed through the Border Patrol Check Point together earlier that morning, yet when interviewed by Agent Rarmirez, Mr. Gamez indicated that he had picked up Mr. Torres and Mr. Martinez on the side of the road north of the Check Point.   When these facts are considered in conjunction with the circumstances that initially led Agent Quezada to detain Defendants, Agents Quezada and Ramirez clearly possessed probable cause to believe that the detainees were engaged in smuggling activities and were connected to the group of aliens the agents had just apprehended. Accordingly, the agents were justified in continuing and expanding the scope of their investigation.

Defendant Gamez argues, however, that there were less intrusive means of investigation that the agents could have used—instead of transporting them back to the Check Point—to confirm or dispel their suspicions of criminal activity. (Doc. 45 at 10.) In determining whether an investigative detention exceeded the bounds of what is reasonable under the circumstances, the Court need not engage in "unrealistic second-guessing." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).   If courts were to engage in this type of post hoc evaluation of police conduct, it would be horribly disruptive, as one "can almost always imagine some alternative means by which the objectives of the police might have been accomplished." *Id.* at 686–87. The question for the Court is not whether some alternative means of investigation existed, but whether the agents pursued a means of

investigation that was likely to quickly confirm or dispel their suspicions, and then, whether they acted reasonably in their chosen path of investigation. *See id.*

In the case at hand, the agents' observations, in conjunction with their training and experience, quickly led them to shift the focus of the investigation from verifying the detainees' citizenship to determining whether they were engaged in alien smuggling. Through their questioning and observations, the agents then developed probable cause to believe that the detainees were engaged in smuggling activities and were connected to the group of aliens the agents had just apprehended. The agents were therefore justified in prolonging their investigation, and if necessary, removing Defendants from the vehicle for officer safety or to search for evidence of illegal aliens and/or smuggling activities. The agents decided to leave the roadway and continue their investigation at the Falfurrias Check Point. The agents knew that the Defendants had criminal histories, Defendant Martinez had failed to provide any identification to the agents, it was very early in the morning and still dark outside, there had been recent criminal activity in the area, and there was the additional danger posed by other traffic on the roadway. Therefore, the agents' decision to move the investigation off the roadway to the safety of the Border Patrol Check Point was reasonable.

Moreover, the search of the vehicle and backpacks at the Check Point did not constitute a Fourth Amendment violation as the agents had probable cause to believe they contained evidence of the crime they were investigating. At the Check Point, the agents continued their investigation, obtaining a more detailed report of the Defendants' criminal histories and learning from the group of illegal aliens that they had been abandoned by their guides. The facts continued to indicate that Defendants were engaged in the smuggling of illegal aliens and that evidence of the crime may be

found in the vehicle or backpacks. *See Arizona v. Gant*, 129 S. Ct. 1710, 1721 (2009) (permitting warrantless search of a vehicle when "it is reasonable to believe the vehicle contains evidence of the offense of arrest"). In particular, the agents believed they might find food, water, clothing, or other items that brush guides typically carry. As backpacks constitute a tool of the trade for brush guides, it was reasonable for the agents to believe they would contain evidence of the crime for which Defendants had been detained. When Agent Muniz smelled the odor of marijuana emanating from the backpacks, this provided additional probable cause. Accordingly, the search of the vehicle and the backpacks did not violate the Fourth Amendment.

In sum, extending the initial investigatory detention—which involved removing Defendants from the roadway and transporting them back to the Falfurrias Border Patrol Check Point—did not violate the Fourth Amendment because the Border Patrol agents had probable cause to believe that Defendants had committed or were committing a violation of federal law. Law enforcement need not possess probable cause at the initiation of an investigatory detention to expand its scope: their investigation may reveal additional facts that give rise to probable cause and justify prolonging the detention or performing a warrantless search of the suspects or their belongings. In the case at hand, after the initial stop, the agents' observations and questioning led him to conclude that the occupants were engaged in smuggling illegal aliens. This was based not only on the facts available before the stop, but on new facts that emerged during the course of the investigation. *See Brigham*, 382 F.3d at 512 (concluding that the purpose of an investigatory detention can evolve as new facts come to light). Having considered the totality of the circumstances available to Agent Quezada and Ramirez, in light of their training and experience, the Court concludes that there was probable cause for them to believe Defendants had committed or were committing a federal offense. Additionally, the

11

warrantless search of the vehicle and backpacks did not constitute a Fourth Amendment violation because it was reasonable for the agents to believe that they contained evidence of the crime which they were investigating.

## IV.    CONCLUSION

First, the Court concludes that Agent Quezada had reasonable suspicion to stop the white Cadillac sedan driven by Mr. Gamez and briefly detain Defendants to confirm or dispel his suspicions that they were engaged in illegal activity.  Second, the Court concludes that additional facts became available to Agent Quezada and Agent Ramirez during the initial investigatory detention which gave rise to probable cause and allowed the agents to prolong their investigation and search Defendants' vehicle and backpacks for evidence of the crime they were investigating.  As the agents acted with reasonable suspicion and probable cause in their investigation, the Court concludes that their actions did not constitute a Fourth Amendment violation.

WHEREFORE, the Court hereby **DENIES** Defendants' Motions to Suppress. (D.E. 25, 26, 27.)

September 6, 2011.

HAYDEN HEAD
SENIOR UNITED STATES DISTRICT JUDGE